20 F.3d 1160
 KOYO SEIKO CO., LTD. and Koyo Corporation of U.S.A., Inc.,
Plaintiffs/Cross-Appellants,
v.
The UNITED STATES, Defendant,
and
The Timken Company, Defendant-Appellant.
NSK LTD. and NSK Corporation, Plaintiffs-Appellees,
v.
The UNITED STATES, Defendant,
and
The Timken Company, Defendant-Appellant.
 Nos. 93-1310, 93-1341 and 93-1311.
 United States Court of Appeals,
Federal Circuit.
 March 28, 1994.
 
 James R. Cannon, Jr., Stewart and Stewart, Washington, DC, argued, for defendant-appellant. With him on the brief, were Eugene L. Stewart, Terence P. Stewart and John M. Breen.
 Susan P. Stommer, Powell, Goldstein, Frazer & Murphy, Washington, DC, argued, for plaintiffs/cross-appellants. With her on the brief, were Peter O. Suchman and T. George Davis, Jr.
 Joseph F. Donohue, Jr., Donohue and Donohue, New York City, argued, for plaintiffs-appellees. With him on the brief, was Kathleen C. Inguaggiato.
 Before ARCHER, Chief Judge,* FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.
 RADER, Circuit Judge.
 
 
 1
 Twenty years ago the Timken Company requested an antidumping investigation of tapered roller bearings (TRBs) four inches or less in outside diameter imported from Japan. The United States Department of Treasury initiated the investigation and calculated dumping margins for many TRB entries. Koyo Seiko Co., Ltd., Koyo Corporation of U.S.A., Inc. (collectively "Koyo"), NSK Ltd. and NSK Corporation (collectively "NSK") made extensive entries of TRBs between 1974 and 1979 which were subject to the investigation. In 1980, the Department of Commerce assumed responsibility for administering the antidumping law. Commerce commenced administrative reviews, gathered additional information, and recalculated the dumping margins.
 
 
 2
 In 1992, the Court of International Trade instructed Commerce's International Trade Administration (ITA) to disregard the data from its investigation of certain TRB entries and to liquidate them under Treasury's earlier dumping margins. On March 4, 1993, the trial court upheld ITA's reliance on Treasury dumping margins and the recalculation of dumping margins for the remaining TRB entries. Both parties appealed. This court reverses-in-part and affirms-in-part.
 
 BACKGROUND
 
 3
 The Court of International Trade set forth the relevant facts for both of these cases in published opinions. Koyo Seiko Co. v. United States, 819 F.Supp. 1093 (Ct.Int'l Trade 1993); Koyo Seiko Co. v. United States, 796 F.Supp. 517 (Ct.Int'l Trade 1992); NSK Ltd. v. United States, 794 F.Supp. 1156 (Ct. Int'l Trade 1992). Therefore, this court may confine itself to the facts pertinent to this appeal.
 
 
 4
 On October 31, 1973, Timken filed a petition for imposition of antidumping duties on TRBs from Japan. Tapered Roller Bearings from Japan; Antidumping Proceeding Notice, 38 Fed.Reg. 33,408 (Dep't Treas.1973). Under the Antidumping Act of 1921, 19 U.S.C. Secs. 160-173 (1976), amended by 19 U.S.C. Secs. 161, 168 (Supp. II 1978) (repealed 1979) (the 1921 Act), Treasury initiated an investigation and published a dumping finding on August 18, 1976. Tapered Roller Bearings and Certain Components from Japan, 41 Fed.Reg. 34,974 (Dep't Treas.1976). The dumping finding covered Koyo's and NSK's entries. These entries, however, were never liquidated.
 
 I. Koyo v. United States
 
 5
 Between 1977 and 1980, Treasury prepared a series of master lists covering Koyo's TRB entries from April 1, 1974 through September 30, 1977 (the 1974-1977 entries). These master lists enabled U.S. Customs Service officials to appraise the entries and assess antidumping duties. One master list covered entries from April 1973 through December 1976. Another covered entries from January 1977 through September 1977. Koyo, however, disputed the accuracy of the 1973-1976 master list. Treasury suspended this master list due to possible errors.
 
 
 6
 Effective January 1, 1980, Congress enacted the Trade Agreements Act of 1979 (Trade Agreements Act). The Trade Agreements Act of 1979, Pub.L. No. 96-39, 93 Stat. 144 (codified as amended in scattered sections of 19 U.S.C.). The Trade Agreements Act repealed the 1921 Act and amended the Tariff Act of 1930. Section 106(a), 93 Stat. at 193. Section 751(a) of the Trade Agreements Act made dumping findings under the 1921 Act subject to an annual review. Section 751(a), 93 Stat. at 175 (current version at 19 U.S.C. Sec. 1675(a) (1988)).
 
 
 7
 On January 2, 1980, Commerce assumed administration of the antidumping laws. Exec. Order No. 12,188, 3 C.F.R. 131 (1981), reprinted in 19 U.S.C. Sec. 2171 (1988). Commerce's ITA issued a corrected master list with a lower dumping margin for the January 1977 to September 1977 entries. On March 28, 1980, ITA began a section 751(a) administrative review of the 1976 dumping finding. Administrative Review of Antidumping Determinations, 45 Fed.Reg. 20,511 (Dep't Comm.1980). ITA suspended liquidation of entries covered by master lists under section 751(a) review. ITA began to verify Koyo's submitted information and reevaluate the dumping margins.
 
 
 8
 In 1982, Commerce reached some preliminary results in its administrative review. The preliminary draft contained dumping margins of 1.95% or less for Koyo's TRB entries from April 1973 to July 1980. Although disclosed to Koyo, these results were not published. Again, Customs did not liquidate any Koyo entries under these dumping margins.
 
 
 9
 On September 19, 1983, Timken submitted to ITA an allegation that Koyo sold TRBs in its home market at prices below the full cost of production. In response, ITA initiated a cost-of-production (COP) investigation for Koyo's TRB entries from April 1, 1978 through March 31, 1979 (the 1978-1979 entries).
 
 
 10
 In 1984, section 751(a) was amended to require annual reviews only upon the request of interested parties. 19 U.S.C. Sec. 1675(a). Timken requested such a review. ITA requested additional data from Koyo and conducted verifications of Koyo's submitted information. Accordingly, ITA discovered likely inaccuracies in the previous dumping margins. In response, Koyo requested several extensions of time. ITA noted several times that Koyo's submissions were incomplete. In 1986, Koyo finally informed ITA that all documents for entries before 1980 had been destroyed.
 
 
 11
 During this process, ITA twice changed its methodology for calculating dumping margins, first adopting a three-criteria and then a five-criteria test. In 1987, ITA concluded that Koyo's submission was unacceptable. In addition, ITA noted that Koyo resisted requests for additional data. ITA therefore used a combination of data from its investigation and the "best information available" for the April 1974 to July 1985 TRB entries. See 19 U.S.C. Sec. 1677e(c) (1988).
 
 
 12
 Finally, on June 1, 1990, ITA issued its final determination. Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administrative Review, 55 Fed.Reg. 22,369 (Dep't Comm.1990) (TRB Final Results ). The determination relied on the data from ITA's investigation and "best information available" after Commerce took over the investigation, not on the Treasury master lists. Id. at 22,370, 22,375-76. Over Koyo's objection, ITA performed a cost-of-production (COP) analysis based on the best information available for the 1978-1979 entries. Thus, ITA disregarded sales in the home market below the COP when computing the foreign market value of the TRBs. See 19 U.S.C. Sec. 1677b(b) (1988). Under this method, Koyo's final dumping margins ranged from 18.81% to 35.89% for 1974-1977 and 1978-1979 entries.
 
 
 13
 Koyo challenged these results in the Court of International Trade. On May 15, 1992, the trial court granted Koyo's motion to liquidate the 1974-1977 TRB entries according to the pre-existing Treasury master lists, excluding the results of ITA's later investigation. The trial court also remanded the case with instructions to, inter alia, recalculate dumping margins for the 1978-1979 entries without reference to the COP investigation.
 
 
 14
 On August 21, 1992, the Court of International Trade denied Timken's motion for rehearing on the COP analysis issue. The court permitted Timken, however, to supplement its original below-cost allegation with information not derived from ITA's investigation.
 
 
 15
 On remand, ITA used a Treasury master list covering the 1977 entries that was corrected by Commerce in 1980. ITA determined to liquidate these entries in accordance with these corrections, and the 1974-1976 entries in accordance with the other Treasury master list. In addition, Timken's supplemental disclosure showed a reasonable probability that Koyo sold TRBs in the home market below cost. On the basis of this showing, ITA undertook a new COP investigation. Again ITA calculated new dumping margins for the 1978-1979 entries. This new calculation also excluded from the foreign market value sales below cost in the home market. The new final margins were 17.96% and 24.64% for the 1978-1979 entries. Timken challenged these results in the trial court, arguing that ITA could not use Treasury's 1977 master list as corrected by ITA in 1980.
 
 II. NSK v. United States
 
 16
 NSK's TRB entries fell within Treasury's August 18, 1976 dumping finding. Tapered Roller Bearings and Certain Components from Japan, 41 Fed.Reg. 34,974 (Dep't Treas.1976). Treasury issued three master lists for NSK's entries from May 1, 1974 to March 31, 1978 (the 1974-1978 entries). Treasury, however, doubted the accuracy of these master lists. In an Investigation Report dated October 17, 1979, Treasury noted that NSK could not substantiate many of its claims. Treasury suspended the master list covering the 1977-1978 entries. There is no evidence that NSK's entries were liquidated under these master lists.
 
 
 17
 In 1980, Commerce's ITA assumed administration of the anti-dumping law and commenced annual section 751(a) reviews. On May 19, 1980, NSK applied for revocation of the antidumping order. At ITA's request, starting in 1981 NSK submitted a series of reports. These reports showed de minimis dumping margins for TRB sales from May 1974 through July 1980.
 
 
 18
 Based on NSK's calculations, ITA drafted in 1982 a preliminary determination. ITA did not publish these preliminary results. ITA received an objection that NSK had calculated its own dumping margins. In response to this objection, ITA sought to obtain NSK's raw data to recalculate independently the dumping margins. NSK did not produce all of the data requested by ITA.
 
 
 19
 In 1986, ITA began another section 751(a) review of NSK's TRB entries from April 1, 1974 through July 31, 1980. After using three different methodologies to calculate dumping margins, ITA published its final results on June 1, 1990. TRB Final Results, 55 Fed.Reg. 22,369. This determination did not rely on the pre-existing Treasury master lists. Rather, the determination rested on information developed during ITA's own lengthy investigation. NSK challenged the final results in the Court of International Trade.
 
 
 20
 On May 21, 1992, the trial court ordered liquidation of entries between May 1, 1974 and March 31, 1978 in accordance with Treasury master lists predating the transfer of jurisdiction to Commerce. On remand, ITA corrected a clerical error and ordered liquidation in accordance with corrected Treasury master lists. NSK appealed again to the trial court.
 
 
 21
 III. The Court of International Trade Decision
 
 
 22
 The trial court addressed the Timken and NSK appeals in its March 4, 1993 decision. The court held, inter alia, that Commerce acted reasonably in using the Treasury master lists for Koyo's 1974-1977 entries and NSK's 1974-1978 entries. In addition, the court upheld ITA's decision to correct the master lists for Koyo and the final results for NSK. Thus, the Court of International Trade upheld the remand results in all respects, including ITA's reliance on the COP analysis for Koyo's 1978-1979 entries.
 
 
 23
 Timken appeals the trial court's decision to liquidate Koyo's 1974-1977 entries and NSK's 1974-1978 entries according to Treasury master lists. Koyo cross-appeals to challenge the court's approval of ITA's COP analysis in calculating dumping margins for the 1978-1979 entries.
 
 ANALYSIS
 
 24
 Title 19 authorizes the Court of International Trade to review final results of an ITA administrative review. 19 U.S.C. Sec. 1516a(a)(2)(B)(iii) (1988); U.H.F.C. Co. v. United States, 916 F.2d 689, 696 (Fed.Cir.1990). When reviewing an ITA determination, the trial court must "hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. Sec. 1516a(b)(1)(B). This appellate court reviews the trial court's decision by applying anew the statute's express judicial review standard. PPG Indus. v. United States, 978 F.2d 1232, 1236 (Fed.Cir.1992).
 
 I.
 
 25
 The trial court ordered ITA to liquidate Koyo's 1974-1977 entries and NSK's 1974-1978 entries under the Treasury master lists. The court, relying on its Timken Co. v. Regan, 4 C.I.T. 174, 552 F.Supp. 47 (1982), decision, reasoned that section 751(a) does not permit annual review of entries covered by master lists issued before the effective date of the Trade Agreements Act.
 
 
 26
 Section 751(a) of the Trade Agreements Act, as initially enacted, directed ITA to conduct annual administrative reviews of antidumping duty orders:
 
 
 27
 At least once during each 12-month period beginning on the anniversary of the date of publication of a countervailing duty order under this title or under section 303 of this Act, an antidumping duty order under this title or a finding under the Antidumping Act, 1921, or a notice of the suspension of an investigation, the administering authority, after publication of notice of such review in the Federal Register, shall--
 
 
 28
 (A) review and determine the amount of any net subsidy,
 
 
 29
 (B) review, and determine ... the amount of any antidumping duty, and
 
 
 30
 (C) review the current status of, and compliance with, any agreement by reason of which an investigation was suspended, and review the amount of any net subsidy or margin of sales at less than fair value involved in the agreement,
 
 
 31
 and shall publish the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed in the Federal Register.
 
 
 32
 Section 751(a), 93 Stat. at 175.
 
 
 33
 Section 751(a) did not limit the obligation to perform annual reviews to antidumping duty orders issued under the Trade Agreements Act of 1979. Rather, section 751(a) expressly subjected findings under the 1921 Act to 751(a) review. In the words of the statute, administrative review extended to "an antidumping duty order under this title or a finding under the Antidumping Act, 1921." Id.
 
 
 34
 Moreover, section 106(a) of the Trade Agreements Act expressly made "findings in effect on the effective date of this Act, or issued pursuant to court order in an action brought before that date ... subject to review under section 751." Section 106(a), 93 Stat. at 193. Thus, the Trade Agreements Act made findings pending under the 1921 Act subject to section 751(a) annual review.
 
 
 35
 Section 751(a) did not exclude findings which had progressed to the assessment phase from the ambit of section 751(a) review. Rather, subpart (1)(B) of the section grants Commerce authority to review the amount of any antidumping duty. The 1921 Act, as well as the Trade Agreements Act, set the amount of the antidumping duty during the assessment phase of the proceeding. Thus, subpart (1)(B) envisions review of the entries covered by master lists and other procedures setting the "amount of any antidumping duty."
 
 
 36
 The enactment history of section 751(a) of the 1979 Act underscores that annual reviews extend to the assessment phase of the antidumping investigation. Both the House and Senate reports explaining section 751(a) contain identical language:
 
 
 37
 [Section 751 review] expedites the administration of the assessment phase of antidumping and countervailing duty investigations.
 
 
 38
 H.R.Rep. No. 317, 96th Cong., 1st Sess. 72 (1979); S.Rep. No. 249, 96th Cong., 1st Sess. 80-81 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 466-67. In sum, section 751(a) review includes administrative review of unliquidated entries covered by master lists--the assessment phase--as part of the review of findings.
 
 
 39
 Moreover, section 751(a) expressly contemplated the resumption of an investigation as a result of an administrative review. Thus, ITA had the authority to resume Treasury investigations. Section 751(a) implies that ITA could recalculate dumping duties based on information from the reinitiated investigation.
 
 
 40
 Under section 751(a), ITA could either rely on Treasury master lists as best information available, see Tapered Roller Bearings and Certain Components Thereof From Japan, 49 Fed.Reg. 8,976, 8,977 (Dep't Comm.1984), or recalculate dumping margins based on information gathered during its reinitiated investigation. While the scope of the reinitiated investigation is limited by the terms of the underlying Treasury dumping finding, see Alsthom Atlantique v. United States, 787 F.2d 565, 571 (1986), the dumping finding itself is clearly not immune from section 751(a) review.
 
 
 41
 In accordance with section 751(a), ITA initiated annual reviews of outstanding dumping findings under the Antidumping Act of 1921. Administrative Review of Antidumping Determinations, 45 Fed.Reg. 20,511 (Dep't Comm.1980). ITA properly listed the August 18, 1976 dumping finding as subject to review.[1] Although the proceedings in this case had progressed to the assessment phase, section 751(a) envisioned a renewal of administrative review of the dumping duties.
 
 
 42
 In this case, ITA encountered master lists which it had reason to believe were inaccurate or incomplete. Indeed, ITA discovered that NSK and Koyo could not substantiate much of their data. ITA thus resumed the investigation under the authority of section 751(a) and recalculated dumping margins using data from its investigation and the "best information available." The trial court erred in requiring ITA to liquidate Koyo and NSK entries under the flawed Treasury master lists.
 
 
 43
 The trial court also erred in concluding that section 1002(b)(3) "reflects Congress' intent that any cases pending before the effective date of the bill 'and cases which were far advanced in the administrative process before the effective date, are to proceed as if the bill had not been enacted into law.' " Koyo Seiko, 796 F.Supp. at 522 (quoting S.Rep. No. 249, at 255, reprinted in 1979 U.S.C.C.A.N. at 641). Section 1002(b)(3) provided:
 
 
 44
 (b) TRANSITIONAL RULES.--
 
 
 45
 ....
 
 
 46
 (3) CERTAIN COUNTERVAILING AND ANTIDUMPING DUTY ASSESSMENTS.--The amendments made by this title shall apply with respect to the review of the assessment of, or failure to assess, any countervailing duty or antidumping duty on entries subject to a countervailing duty order or antidumping finding if the assessment is made after the effective date. If no assessment of such duty had been made before the effective date that could serve the party seeking review as the basis of a review of the underlying determination, made by the Secretary of the Treasury or the International Trade Commission before the effective date, on which such order, finding, or lack thereof is based, then the underlying determination shall be subject to review in accordance with the law in effect on the day before the effective date.
 
 
 47
 93 Stat. at 307 (reprinted at 19 U.S.C. Sec. 1516a note (1988)).
 
 
 48
 Section 1002 is within Title X of the Trade Agreements Act. Title X, containing two sections, pertains solely to judicial review. Section 1001 of Title X provides judicial review for antidumping and countervailing duty cases under the Act.
 
 
 49
 Section 1002 sets forth the Act's effective date and gives transitional rules for judicial review, not ongoing administrative review, of pending antidumping proceedings. It does not address at all section 751(a) administrative review of cases. It does not require that entries must be liquidated in accordance with pre-existing master lists.
 
 
 50
 Again the enactment history illuminates the meaning of section 1002. Both the House and Senate reports explain that section 1002's transitional rules merely provide judicial review under Title X for certain assessments made after the effective date:
 
 
 51
 Generally, the bill would provide for judicial review of pending cases, and cases which were far advanced in the administrative process before the effective date, to proceed as if the bill had not been enacted into law.
 
 
 52
 S.Rep. No. 249, at 255, reprinted in 1979 U.S.C.C.A.N. at 641; see also H.R.Rep. No. 317, at 182-83.
 
 
 53
 The trial court erred in reading section 1002 as limiting administrative review under section 751(a). Section 1002(b)(3) applies only to preserve judicial review of cases initiated under the Antidumping Act of 1921.
 
 
 54
 Section 102 of the Trade Agreements Act also does not limit, or address at all, application of section 751(a) review to entries covered by master lists. Section 102, 93 Stat. at 189 (1979) (reprinted at 19 U.S.C. Sec. 1671 note (1988)). Section 102 merely specified how the time limits of the Trade Agreements Act apply to cases pending under the 1921 Act. Section 102 simply does not exclude any pending antidumping cases from section 751(a) review. In sum, sections 1002(b)(3) and 102 do not limit at all the statutory language applying section 751(a) to entries covered by pre-existing Treasury master lists.
 
 
 55
 Although Treasury published its dumping finding in 1976, ITA did not publish a Final Determination until 1990. The undue length of this investigation understandably and justifiably disturbed the Court of International Trade. The Trade Agreements Act sought, among other objectives of the Act, to encourage expeditious determination and assessment of antidumping duties. See, e.g., S.Rep. No. 249, at 66, reprinted in 1979 U.S.C.C.A.N. at 452 ("A major objective of this revision of the antidumping duty law is to reduce the length of an investigation."); id. at 76-77, reprinted in 1979 U.S.C.C.A.N. at 462-63 ("In light of the dismal performance of the Department of the Treasury in assessing special dumping duties in the recent past, the committee considers this time limit on assessment to be an extremely important addition to the law.").
 
 
 56
 The excessive delays in this case, however, did not require ITA to rely on inaccurate or incomplete master lists. The Trade Agreements Act also sought to provide fair assessment of antidumping duties to protect domestic industry. See H.R.Rep. No. 317, at 44 (1979) (Key United States objectives are "to provide effective relief from injurious dumped imports ... and to ensure fair and equitable treatment of all parties concerned with anti-dumping proceedings."). In sum, the Act did not sacrifice fairness and accuracy for the sake of expediency alone. See H.R.Rep. No. 317, at 72 (Section 751 "expedites the administration of the assessment phase of antidumping ... duty investigations while providing a greater role for domestic interested parties and introducing more procedural safeguards."). The inordinate length of this investigation does not override the trial court's duty to ensure ITA's compliance with the review obligations of section 751(a). This court reverses-in-part and remands both cases to determine the dumping margins for Koyo's 1974-1977 entries and NSK's 1974-1978 entries.
 
 II.
 
 57
 Koyo cross-appeals the trial court's decision to allow ITA to conduct a COP investigation. Koyo argues that Timken did not timely file its below-cost allegation. Koyo appeals the trial court's alleged failure to address the timeliness issue.
 
 Section 773(b) of the Tariff Act states:
 
 58
 Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation ... have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise.
 
 
 59
 19 U.S.C. Sec. 1677b(b). In 1983, Timken submitted an allegation that Koyo sold TRBs in Japan below its own cost of production. At that time, no statute or regulation set a time limit for submission of such allegations. ITA determined the timeliness of below-cost allegations on a case-by-case basis. ITA generally relied on two factors to decide an allegation's timeliness: (1) whether the petitioner submitted the allegation either before publication of preliminary results or with enough time remaining in the investigation to allow a proper COP investigation; and (2) if not, whether the petitioner had sufficient information before the preliminary determination to allow earlier filing of the allegation. See, e.g., Certain Carbon Steel Butt-Weld Pipe Fittings from Taiwan; Final Determination of Sales at Less Than Fair Value, 51 Fed.Reg. 37,772, 37,773 (Dep't Comm.1986) (allegation submitted 70 days before due date of final determination deemed untimely because the ITA determined that it required at least 86 days to perform an investigation and because petitioner had sufficient information to justify a timely filing); Color Television Receivers from Korea; Final Results of Antidumping Duty Administrative Review, 51 Fed.Reg. 41,365, 41,374 (Dep't Comm.1986) (allegation deemed untimely because insufficient time remained before the final due date and because the petitioner had sufficient information earlier to file a timely allegation); Certain Steel Valves and Certain Parts Thereof from Japan; Final Determination of Sales at Less Than Fair Value, 49 Fed.Reg. 25,266, 25,268 (Dep't Comm.1984); Bicycle Speedometers from Japan; Final Results of Administrative Review of Antidumping Finding, 47 Fed.Reg. 28,978, 28,979 (Dep't Comm.1982); cf. Tempered Sheet Glass from Japan; Final Results of Administrative Review and Revocation of Antidumping Finding, 49 Fed.Reg. 8,975, 8,976 (Dep't Comm.1984) (allegation submitted after publication of the preliminary results timely because petitioner did not know of the below-cost sale until after the publication).
 
 
 60
 ITA did not depart from this standard in accepting Timken's allegation. Timken submitted its allegation in 1983; ITA published its preliminary results for Koyo's 1978-1979 entries in 1989. Tapered Roller Bearings Four Inches or Less in Outside Diameter and Certain Components Thereof from Japan, Preliminary Results of Antidumping Duty; Administrative Review, 54 Fed.Reg. 12,938 (Dep't Comm.1989). ITA treated Timken's 1983 petition as timely. TRB Final Results, 55 Fed.Reg. at 22,370.[2] The trial court properly sustained ITA's action.
 
 CONCLUSION
 
 61
 This court reverses the Court of International Trade's affirmance of ITA's liquidation of Koyo's 1974-1977 and NSK's 1974-1978 TRB entries under the Treasury master lists. This court remands both cases for a redetermination of final dumping margins. In addition, this court affirms the trial court's affirmance of ITA's incorporation of its COP investigation into its final results for Koyo's 1978-1979 TRB entries.
 
 COSTS
 
 62
 Each party shall bear its own costs.
 
 
 63
 AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED.
 
 
 
 *
 Chief Judge Archer assumed the position of Chief Judge on March 18, 1994
 
 
 [1]
 The scope of the reviews included "all entries with dates of purchase or export, as appropriate, occur[r]ing subsequent to the period covered by the last published master list, or, as a minimum, the last 12-month period." Administrative Review of Antidumping Determinations, 45 Fed.Reg. 20,511, 20,512 (Dep't Comm.1980). The notice therefore embraced entries within the last 12 months yet covered by a master list. ITA later determined to subject all unliquidated entries at issue covered by the 1976 dumping finding to administrative review
 
 
 [2]
 In addition to treating Timken's 1983 petition as timely, ITA determined that another Timken petition was not timely:
 Timken did not raise the issue of sales below cost for the earlier periods until after we published the preliminary results and, therefore, the request was untimely.
 TRB Final Results, 55 Fed.Reg. at 22,370.