Opinion

Tsoucalas, Judge:

Plaintiffs, NSK Ltd. and NSK Corporation (collectively “NSK”), commenced this action pursuant to Rule 56.2 of the Rules of this Court for judgment upon the agency record contesting one aspect of the Department of Commerce, International Trade Administration’s (“Commerce” or “ITA”) final determination of administrative reviews, entitled Tapered Roller Bearings, Four Inches or Less in Diameter, and Components Thereof, From Japan (“Final Results”), 59 Fed. Reg. 56,035 (1994).
Background
On July 9, 1986, Commerce published a notice of its initiation of administrative reviews of sales of tapered roller bearings (“TRBs”) imported from April 1974 through July 1985. See Initiation of Antidumping Duty Administrative Reviews, 51 Fed. Reg. 24,883 (1986). On October 3, 1986, Commerce initiated an administrative review of TRBs imported from Japan during the period of August 1, 1985 through July 31, 1986. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 51 Fed. Reg. 35,384 (1986).
On June 1,1990, Commerce published the final results of its administrative reviews of sales of TRBs for the period of April 1, 1974 through July 31, 1980. Tapered Roller Bearings Four Inches or Less in Outside Diameter From Japan; Final Results of Antidumping Duty Administra *1165 tive Review, 55 Fed. Reg. 22,369 (1990). NSK appealed the results, and the Court held that NSK’s entries between the dates of May 1,1974 and March 31, 1978, should not have been subject to review by Commerce but, rather, should have been liquidated in accordance with “master lists”[1] prepared by the United States Treasury before Commerce possessed jurisdiction over dumping issues. NSK Ltd. v. United States, 16 CIT 401, 404, 794 F. Supp. 1156, 1159 (1992). On remand, pursuant to the Court’s instructions, Commerce recalculated the dumping margins for the periods not covered by the master lists. Koyo Seiko Co. v. United States, 17 CIT 131, 132-33, 819 F. Supp. 1093, 1095-96 (1993), aff'd in part and rev’d in part, Koyo Seiko Co. v. United States, 20 F.3d 1160 (Fed. Cir. 1994). For the four month period of April 1, 1978 through July 31, 1978, Commerce calculated a margin rate of 39.60%. On appeal, the United States Court of Appeals for the Federal Circuit (“CAFC”) reversed the Court’s decision and ordered a remand to permit Commerce to redetermine the dumping margins for all of the review periods without resort to the master lists. Koyo Seiko, 20 F.3d at 1167. On remand, for NSK’s imports between August 1,1977 andMarch31,1978, Commerce calculated a dumping margin of 18.63%. In sum, for the 1977-78 review, Commerce determined a four month rate of39.60% and an eight month rate of 18.63%.
On November 10, 1994, Commerce published its final determination for the six reviews conducted during the time spanning from August 1, 1980 through July 31, 1986. See Final Results, 59 Fed. Reg. at 56,035. In the Final Results, due to deficiencies in NSK’s home market sales data, Commerce applied best information available (“BIA”) to all U.S. models that were not matched with identical home market models. Id. at 56,049. NSK now contests Commerce’s decision to select as BIA the 39.60% rate calculated for the four month period of April 1, 1978 through July 31, 1978.[2]
Discussion
The Court’s jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1994) and 28 U.S.C. § 1581(c) (1994).
The Court must uphold Commerce’s final determination unless it is “unsupported by substantial evidence on the record, or otherwise not in accordance with law.” 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is “more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. ” Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). “It is not within the Court’s domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a *1166 differing interpretation of the record.” Timken Co. v. United States, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988), aff'd, 894 F.2d 385 (Fed. Cir. 1990).
In the Final Results at issue, Commerce explained its choice of BIA as follows:
With respect to the choice of BIA, we note that, throughout the many delays that have arisen in the course of the 1980/86 reviews, NSK has generally been a cooperative respondent. Accordingly, for those U.S. sales where no identical matches are possible, we have relied on a second-tier BIA rate, which is the highest margin for NSK from any preceding review period.
59 Fed. Reg. at 56,049.
NSK challenges Commerce’s selection of BIA as constituting a misapplication of the two-tier BIA rule. NSK emphasizes that to date, in cases where Commerce has used a BIA rate based on a prior administrative review of a company, Commerce has relied on a rate calculated for a period of twelve months or more. NSK argues that applying a rate based upon four months of the review period was inconsistent with Commerce’s two-tier methodology as described in Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1190-91 (Fed. Cir. 1993). Pls.’ Mem. Supp. Mot. J. Agency R. at 10-12.
NSK further maintains that a four month rate is not an accurate representation of a company’s sales practices. In support of its position, NSK points out that for purposes of conducting less than fair value investigations (“LTFV”), Commerce reviews at least six months of sales. Pis.’ Mem. Supp. Mot. J. Agency R. at 13. NSK also insists that the four month rate is not an accurate representation of a margin from any prior review period as it is substantially higher than the rates calculated for other periods of review. Id. at 14-15. To avoid the alleged distortion produced by use of the four month rate, NSK suggests that the Court order Commerce to recalculate the BIA rate by weight-averaging the eight month rate (18.63%) with the four month rate (39.60%). Id. at 19.
Commerce responds that the two-tier methodology does not require Commerce to choose a rate as BIA based on a particular time frame. While Commerce acknowledges that, generally, rates selected as BIA have been based on full review periods, Commerce emphasizes that the calculation of two rates for the 1977-78 review period was required by special circumstances. Commerce also points out that the Court should grant Commerce considerable deference regarding its choice of BIA since the antidumping statute, relevant regulations and case law are all silent on this issue. Finally, Commerce maintains that its selection of BIA was consistent with the adverse inference rule of BIA and was not punitive because it was based on an actual dumping rate assigned to NSK during a prior review. Defs.’ Opp’n to Pis.’ Mot. J. Agency R. at 5-11.
*1167 The Timken Company (“Timken”), defendant-intervenor, supports Commerce’s choice of BIA. Timken’s Opp’n to Pls.’ Mot. J. Agency R. at 7-13.
In rebuttal, NSK argues that Commerce ignored information demonstrating that the chosen rate was unrepresentative of NSK’s current margins. NSK also stresses that when it submitted its questionnaire response in September 1986, Commerce had yet to publish any margins for NSK for the periods of review beginning in 1974. Therefore, NSK maintains that there is no basis for a presumption that NSKknew at the time of its questionnaire response that failure to submit data would result in the application ofa rate as high as 39.60%. Pis.’ Reply to Opp’n to Mot. J. Agency R. at 5-9.
Section 1677e(c) of Title 19, United States Code (1988), states that Commerce “shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.” In addition, Commerce’s regulations instruct the Secretary to use BIA whenever Commerce:
(1) Does not receive a complete, accurate, and timely response to the Secretary’s request for factual information; or
(2) Is unable to verify, within the time specified, the accuracy and completeness of the factual information submitted.
19 C.F.R. § 353.37(a) (1994). There is no question that NSK’s failure to provide Commerce with certain information concerning home market sales data justified Commerce’s resort to BIA. See Final Results, 59 Fed. Reg. at 56,049. The sole issue before the Court is the propriety of Commerce’s choice of BIA.
In deciding what margin rate to use as BIA, Commerce relied on its two-tier methodology. In Allied-Signal, the CAFC approved of the two-tier methodology described as follows:
[W]hen a respondent refuses to cooperate with the ITA’s requests for information or significantly impedes the administrative review, the ITA selects the higher of the highest rate assigned for any firm in the LTFV investigation or the highest rate calculated in the administrative review. This “first tier” treatment results in the selection of the most adverse margin possible as the best information available. In contrast, respondents who substantially cooperate but nonetheless fail to provide the requested information in a timely manner or in the required form are subject to a “second tier” * * *. When the second tier is employed, the ITA assigns to a respondent the higher of its own prior LTFV rate or the highest rate calculated in the current administrative review.
996 F.2d at 1190-91. In reaching its decision, the CAFC noted that because the statute is silent regarding the appropriate choice of BIA, Commerce’s determination of what constitutes best information must be accorded considerable deference. Id. at 1191.
*1168 In this review, Commerce stated that it employed the less adverse second-tier BIA by using the highest rate calculated for NSK in a prior review. The Court agrees that Commerce’s actions were consistent with its two-tier practice. The 39.60% margin rate was the highest rate computed for NSK in a prior review. There is nothing in the statute, regulation or Allied-Signal that restricts Commerce’s choice of prior rates to a rate derived from a minimum time frame. The fact that Commerce generally uses a rate from a full twelve month period of review does not preclude Commerce from using a four month rate. Furthermore, the unique circumstances surrounding the derivation of two rates for the 1977-78 review period warrants special consideration in this case. Since Commerce usually only computes one rate for a twelve month review period, it naturally follows that BIA rates selected from prior periods of review generally represent full review periods. In this case, however, Commerce was required to compute two separate rates for the 1977-78 review period because of the litigation concerning the master lists. Thus, the particular facts involved in this case support Commerce’s departure from its general practice of relying on prior rates determined on the basis of twelve month periods of review.
The Court also rejects NSK’s argument that the 39.60% rate was unrepresentative of NSK’s actual dumping margin. It is well-established that Commerce may presume that the highest prior margin is the best information available. Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990). In Rhone Poulenc, the CAFC stated that this presumption “reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to be less.” 899 F.2d at 1190. The rate at issue was determined on the basis of NSK’s own data. NSK does not even attempt to argue that the rate was not an accurate representation of the four months of sales for which it was computed. By suggesting that the Court require Commerce to weight-average the four month rate with the eight month rate, NSK basically concedes that the 39.60% rate is an accurate representation of the dumping margin for sales made from April 1, 1978 through July 31, 1978. In addition, the fact that the selected rate is higher than all of the other rates is irrelevant since BIA is a rule of adverse inference. While NSK may not have known that this particular rate would be chosen, NSK should have been aware that any margin chosen by Commerce would be adverse.
Finally, there is no requirement that a respondent must actually know the margins calculated in previous investigations in order for the presumption described in Rhone Poulenc to apply. Therefore, the lack of margin information at the time of NSK’s questionnaire response does not support NSK’s position. NSK should have presumed that any rate selected as BIA would be adverse. See D & L Supply Co. v. United States, 19 CIT 698, 704-05, 888 F. Supp. 1191, 1197 (1995) (upholding Commerce’s application of adverse BIA where non-responding party was *1169 aware that BIA would be applied). Since Commerce had not yet published the margins calculated for any of the periods of review, there was no reason for NSK to believe, when it failed to submit requested information, that any rate selected as BIA would be lower than 39.60%. Thus, the Court concludes that Commerce’s selection of BIA was supported by substantial evidence on the agency record and in accordance with law.
Conclusion
In accordance with the foregoing opinion, this Court, after due deliberation and a review of all papers in this action, finds that Commerce’s actions were in accordance with law and supported by substantial evidence on the agency record. For the reasons stated above, the Final Results are affirmed and plaintiffs’ motion is denied. This case is dismissed.

 Master lists were prepared by the United States Treasury for the purpose of instructing Customs on the appraisal of goods covered by dumping findings.

 On January 17,1995, this Court granted plaintiffs’ motion for a preliminary injunction enjoining the liquidation of the subject entries pending the outcome of this litigation.