30 F.3d 1469
 16 ITRD 1513
 AMERICAN ALLOYS, INC., Elkem Metals Company, Globe
Metallurgical, Inc. and SKW Alloys, Inc.,
Plaintiffs/Cross-Appellants,
Simetco, Inc., Plaintiff,
v.
The UNITED STATES, Defendant-Appellant.
 Nos. 93-1518, 93-1539.
 United States Court of Appeals,
Federal Circuit.
 July 27, 1994.
Rehearing Denied Sept. 15, 1994.
 
 Charles M. Darling, IV, Baker & Botts, L.L.P., Washington, DC, argued for plaintiffs/cross-appellants. With him on the brief were William D. Kramer and David E. Maranville. Of counsel were Stephen L. Teichler, Martin Schaefermeier, Michael X. Marinelli and Clifford E. Stevens.
 A. David Lafer, Senior Trial Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were Frank W. Hunger, Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin., Berniece A. Browne, Sr. Counsel for Antidumping Litigation, and Robert E. Nielsen, Sr. Atty., Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel.
 Before NEWMAN, Circuit Judge, SKELTON, Senior Circuit Judge, and RADER, Circuit Judge.
 RADER, Circuit Judge.
 
 
 1
 Domestic producers of silicon metal, including American Alloys, Inc., initiated an antidumping complaint against their Argentine competitor, Electrometalurgica Andina, S.A.I.C. (Andina). The Department of Commerce (Commerce) determined Andina sold silicon metal at less than fair value. Commerce, however, reduced Andina's dumping margin to account for rebated taxes. On review, the Court of International Trade determined that Commerce erred by not calculating the actual amount of the rebated taxes passed on to domestic consumers of Andina's products. American Alloys, Inc. v. United States, 810 F.Supp. 1294 (Ct. Int'l Trade 1993).
 
 
 2
 Based on statutory construction, this court reverses the Court of International Trade's holding that the rebated taxes were automatically applicable for a reduction of the dumping margin. Commerce adequately determined that Argentine taxes were included in the domestic price. Therefore, this court reverses the trial court's decision that Commerce must calculate the pass-through tax incidence for the rebates.
 
 BACKGROUND
 
 3
 In August 1990, American Alloys petitioned Commerce to impose antidumping duties on silicon metal imports from Argentina. Commerce initiated an investigation and determined that Andina sold silicon metal in the United States at less than fair market value.
 
 
 4
 To determine the fair market value, Commerce assessed the domestic price of silicon metal products in Argentina. The price of silicon metal products in Argentina included several domestic taxes. For exported goods, Argentina either does not assess these taxes or grants a rebate upon export under the "Reembolso" program. The Reembolso program covered national taxes for, among others, the Export Promotion Fund, the Tire Tax, the Truck Engine Tax, the Retirement Fund, the Public Works Fund, the Social Assistance Fund, the Family Subsidies Fund, the National Housing Fund, and Real Estate Taxes.
 
 
 5
 Commerce verified that Andina's domestic prices for silicon metal products included taxes covered by the Reembolso program. Commerce analyzed the legal requirements of the Reembolso program, required Andina to answer a questionnaire about the taxes, and examined shipping licenses including applications for the rebate. Finally, Commerce analyzed a sales transaction to verify that the rebated taxes were included in the price. Commerce concluded that these inquiries verified that the price of Andina's domestic products was 12.5% higher than the price of exports due to the rebates for "Reembolso" taxes on exported goods.
 
 
 6
 Commerce did not, however, conduct an inquiry to determine whether Argentina directly imposed the rebated taxes on the exported silicon metal and whether Andina actually passed these taxes on to its domestic consumers in the form of higher prices. According to Commerce, this form of physical incorporation inquiry occurs in a counter-vailing duty investigation, which American Alloys had not requested.
 
 
 7
 In Final Determination of Sales at Less Than Fair Value: Silicon Metal from Argentina, 56 Fed.Reg. 37,891, 37,895 (Dep't Comm. Aug. 9, 1991), Commerce found that silicon metal from Argentina was sold at less than fair value. In setting the dumping margin, Commerce increased the United States Price by 12.5% to offset the Reembolso tax rebate. American Alloys, 810 F.Supp. at 1295. This adjustment reduced the dumping margin on Andina's United States export sales. Id.
 
 
 8
 Before the Court of International Trade, American Alloys moved for judgment on the agency record under 28 U.S.C. Sec. 1581(c) (1988). American Alloys contended that Commerce should not have reduced the dumping margin because Argentina did not directly impose these Reembolso taxes on silicon metal products. Commerce defended its position by pointing out that this form of physical incorporation inquiry occurs in a countervailing duty investigation. Because American Alloys did not request a countervailing duty investigation, Commerce saw no necessity to perform any type of physical incorporation inquiry nor to determine if the taxes were imposed directly on the product or its components. The trial court sustained Commerce's action. American Alloys appealed that judgment.
 
 
 9
 American Alloys also argued that Commerce should not have reduced the dumping margin without verifying the direct imposition of Reembolso taxes on Andina's domestic customers. The trial court agreed and ordered Commerce to measure the tax incidence of qualifying taxes under the Reembolso program.
 
 DISCUSSION
 
 10
 The trial court must uphold Commerce's rulings unless the rulings are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. Sec. 1516a(b)(1)(B) (1988); Creswell Trading Co. v. United States, 15 F.3d 1054, 1056 (1994). In determining whether the trial court correctly reached its decision, this court reapplies the statutory standard of review to Commerce's ruling. Koyo Seiko Co. v. United States, 20 F.3d 1160, 1164 (1994). Consequently, this court makes its own determination of whether substantial record evidence supports the agency's determinations in accordance with the law. Id.
 
 
 11
 The United States antidumping laws remedy international price discrimination to prevent injury to domestic industries. Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1576 (1993). The Trade Reform Act of 1973 (the Act) imposes duties on imported merchandise that is or is likely to be sold in the United States at less than the fair market value of those goods in the country of manufacture. 19 U.S.C. Sec. 1673 (1988).
 
 
 12
 The Act authorizes the Secretary of Commerce to investigate charges of dumping. Zenith, 988 F.2d at 1576. If an investigation discloses dumping, the Secretary imposes a duty when import sales materially injure, threaten to materially injure, or materially retard the establishment of an industry in the United States. Id. The duty is the difference between foreign market value (FMV) of the goods and the value of those goods in the United States, known as United States price (USP). Id. This difference is also the "dumping margin." Thus, the duty corrects the dumping margin. Id.
 
 
 13
 The Act permits numerous adjustments to FMV and USP to account for differences between these two value measurements unrelated to dumping. See, e.g., 19 U.S.C. Secs. 1677a(d), 1677a(e), 1677b(a)(1), 1677b(a)(4) (1988). Thus, the Act prevents distortions in the dumping margin. See Smith-Corona Group v. United States, 713 F.2d 1568, 1571-72, 1 Fed.Cir. (T) 130, 132-33 (1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984) (pointing out that FMV and USP are subject to adjustments in an attempt to reconstruct the price at a specific, common point in the chain of commerce). To avoid distortion of dumping margins merely because the exporting country taxes home market sales but not export sales, the antidumping laws permit offsetting adjustments to the USP. 19 U.S.C. Sec. 1677a (1988). Otherwise these taxes would raise the apparent cost of the merchandise in the home country in comparison to the United States price. This discrepancy in value would not correspond to dumping at all. Therefore, the Act offsets the domestic taxes by increasing the USP for:
 
 
 14
 the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.
 
 
 15
 19 U.S.C. Sec. 1677a(d)(1)(C) (1988) (emphasis added).
 
 DETERMINATION OF DIRECT TAXES
 
 16
 The Act specifies that the offset applies to taxes imposed "directly upon the exported merchandise or components thereof." Id. The statute thereby permits rebates only for direct domestic taxes. Id. A direct tax is, by definition, a tax "imposed directly upon property, according to its value." Black's Law Dictionary 461 (6th ed.1990). Accordingly, to qualify for a rebate, the Act requires a direct relationship between the tax and the exported product or components of the exported product.
 
 
 17
 The Act does not explicitly set forth an interpretation of this direct relationship. However, the statute, as plainly written, expresses the clear and unambiguous intent of Congress to permit rebates only for a domestic tax that qualifies as a direct tax on the export or on components that are part of the export. Where the language of the statute "is plain, 'the sole function of the courts is to enforce it according to its terms.' " United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Moreover, the legislative history of the Act directly supports this meaning.
 
 
 18
 Prior to the 1974 amendments, the USP was subject to adjustment for taxes imposed "in respect to the manufacture, production, or sale of the merchandise." H.R.Rep. No. 571, 93d Cong., 1st Sess. 69-70 (1973) (emphasis in original). Addition of these taxes to the USP reduced or eliminated any dumping margins that actually existed. Id. at 70. The wording of the 1974 Act restricted those rebates that decreased the size of the dumping duties. See id. The House Report states that:
 
 
 19
 [n]o adjustment to the advantage of the foreign exporter would be permitted for indirect tax rebates unless the direct relationship of the tax to the product being exported, or components thereof, could be demonstrated.
 
 
 20
 Id. at 69.
 
 
 21
 The Senate Hearings evidenced a similar interpretation during questioning of the Secretary of the Treasury, at that time in charge of dumping and countervailing duty investigations. The agency head indicated that:
 
 
 22
 The proposed amendments to the Antidumping Act would tighten the existing guidelines for adding back rebated or remitted taxes to purchase price or exporters sales price.... If it were to be determined in a particular instance that such taxes are not directly imposed upon the merchandise ... they will not be added to purchase price or exporter's sales price. In such circumstances the amendment in question would tend to create or increase the size of dumping margins.
 
 
 23
 Trade Reform Act of 1973, Hearings before the Senate Committee on Finance on H.R. 10710, 93d Cong., 2d Sess. 504-05 (1974).
 
 According to the Senate Hearings:
 
 24
 The definitions of both "purchase price" and "exporter's sales price" are amended to harmonize the treatment of foreign tax rebates under the Anti-dumping act with the standard for their treatment under the countervailing duty law. No adjustment for tax rebates to the advantage of the foreign exporter will be permitted unless the direct relationship between the tax and the exported product or its components can be demonstrated. For example, if the exported product benefited from a tax rebate on the mortgage on the plant that produced it, the rebate could not be used in the computations to reduce the dumping margin.
 
 
 25
 Trade Reform Act of 1973, Hearings before the Senate Committee on Finance on H.R. 10710, 93d Cong., 2d Sess. 310 (1974).
 
 
 26
 The wording of the statute as well as its enactment history evinces an intent by Congress to permit adjustment to the USP only upon demonstration of a direct relationship between the tax and the commodity or its components. The statute does not evince an intent to forgo a determination of physical incorporation in the absence of a companion countervailing duty investigation. Nor does the legislative history provide evidence of such an intent. Rather, the legislative history suggests just the opposite.
 
 
 27
 The internal taxes providing the basis for the Reembolso program included taxes characterized as: Export Promotion Fund; Tire Tax; Truck Engine Tax; Retirement Fund; Public Works Fund; Social Assistance; Family Subsidies; National Housing Fund; and Real Estate Taxes. The nature of taxes included in the Reembolso program suggest that they may not qualify as a direct tax. Without evidence that they are direct taxes, it is unlawful to utilize the rebates to increase the USP. In performing its duty, Commerce did not determine if a direct relationship existed between the rebated taxes and the silicon metal. The Court of International Trade also did not enforce this requirement of the statute.
 
 
 28
 Moreover, one of the stated purposes of the 1974 amendments was to "conform the standard in the Antidumping Act to the standard under the countervailing duty law, thereby harmonizing tax treatment under the two statutes." Report of the Committee on Ways and Means on H.R. 10710, H.R.Rep. No. 571, 93d cong., 1st Sess. 69 (1973). If harmonization is the goal, it makes little sense to utilize one set of rules when there is a countervailing duty investigation and another when there is not.
 
 
 29
 This court finds no support in the 1974 amendments for permitting Commerce to ignore the qualifying taxes standard and to return to the pre-1974 standard in the absence of a companion countervailing duty case. Rather, Congress required, before adjustment of the USP for a rebated tax, that the tax must meet the same test as a tax rebate would meet to avoid a countervailing duty. The tax must bear a direct relationship to the exported product or a physically incorporated component of that product. Commerce may not adjust the USP for tax rebates "unless the direct relationship of the tax to the product being exported, or components thereof [can] be demonstrated." Id. The presence or absence of a companion countervailing duty investigation does not affect this burden.
 
 
 30
 Because Commerce did not determine if Argentina imposed the Reembolso taxes "directly upon the exported merchandise or components thereof," Commerce lacked authority to raise the USP for the rebates. This court reverses the trial court's holding that Commerce need not conduct an inquiry to determine if the rebated taxes were imposed directly on the merchandise at issue and remands for a determination of whether the Reembolso taxes qualify as direct taxes.
 
 INCLUSION IN THE FOREIGN MARKET VALUE
 
 31
 Even if Argentina directly imposed the rebated taxes upon the exported merchandise or its components, the Act requires satisfaction of a second prong before increasing the USP. The Act only adjusts USP for taxes that "are added to or included in the price of such or similar merchandise when sold in the country of exportation." 19 U.S.C. Sec. 1677a(d)(1)(C). In reviewing whether Commerce demonstrated that Andina included these taxes in its home market prices, this court must determine whether substantial evidence supports the agency's position. See Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933, 3 Fed.Cir. (T) 44, 51 (1984). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Matsushita, 750 F.2d at 933 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938)).
 
 
 32
 In view of the language of 19 U.S.C. Sec. 1677a(d)(1)(C), Commerce must calculate and verify the amount of taxes that are passed through to the home market consumer in making the agency's final determination. 19 U.S.C. Sec. 1677e(b)(1). The question unanswered by the statute, and open to interpretation by Commerce, is the proper means for verification.
 
 
 33
 Daewoo Electronics v. International Union, 6 F.3d 1511 (1993) addressed the calculation and verification of pass-through tax incidence for the rebated taxes. Daewoo held that Commerce need not perform an econometric study to calculate whether home market price included the taxes. The Daewoo court indicated:
 
 
 34
 If an exporter's records show that a tax was either a separate "add on" to the domestic price or, although not separately stated, was, in fact, included in the price and that the taxes were paid to the government, that satisfies the tax inquiry required by the statute for an adjustment of the USP.
 
 
 35
 Id. at 1516-17. Moreover, the statute gives Commerce wide latitude in its verification procedures. See Hercules, Inc. v. United States, 673 F.Supp. 454, 469 (Ct.Int'l Trade 1987); Kerr-McGee Chem. Corp. v. United States, 739 F.Supp. 613, 628 (Ct.Int'l Trade 1990).
 
 
 36
 To verify addition of the rebates to the price in the home market, Commerce analyzed the Argentine decree creating the Reembolso program. The agency determined that the taxes fell within the category covered by the Reembolso program. Moreover, Commerce examined the exporter's responses to a questionnaire formulated by the agency, examined an export shipping license with the terms and application of the rebate, and finally, analyzed a sales transaction to verify the base rate of the rebate. This evidence, along with the presumption that a company passes on costs to its consumers, constitutes substantial evidence in support of Commerce's position.
 
 
 37
 Acting without the benefit of Daewoo, the Court of International Trade held that Commerce must undertake a tax pass-through analysis. American Alloys, 810 F.Supp. at 1301. The court required Commerce to measure tax absorption in the foreign country. Id. at 1300. Such a position conflicts with Daewoo, an opinion this court issued after the trial court's decision. In Daewoo, this court acknowledged Commerce's discretion under the Trade Act:
 
 
 38
 [The Act] establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor. The Secretary of Commerce (Secretary) has been entrusted with responsibility for implementing the antidumping law. The Secretary has broad discretion in executing the law.
 
 
 39
 Daewoo, 6 F.3d at 1516, (quoting Smith-Corona, 713 F.2d at 1571). Given the record evidence, this court detects no error in Commerce's conclusion that Andina actually passed the rebated taxes through to its home country consumers. Substantial evidence supports Commerce's conclusion. This court reverses the trial court's rejection of Commerce's verification procedures.
 
 CONCLUSION
 
 40
 This court reverses the trial court's ruling that Reembolso taxes can be treated as direct taxes without a direct tax analysis. This court reverses the trial court's invalidation of Commerce's determination that the Reembolso taxes were added to or included in the price of home market silicon metal.
 
 COSTS
 
 41
 Each party shall bear its own costs.
 
 
 42
 REVERSED.