AMERICAN ALLOYS, INC., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

Slip Op. 97–37.
Court No. 94–01–00046.

United States Court of International Trade.

March 28, 1997.

Baker & Botts, L.L.P. (William D. Kramer, Charles M. Darling, IV, David E. Maranville, Andrea F. Farr), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeffrey M. Telep, Washington, DC), Robert E. Nielsen, Valparaiso, IN, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for defendant.

OPINION

CARMAN, Chief Judge:

Plaintiffs, American Alloys, Incorporated ("American Alloys"), American Silicon Technologies, Elkem Metals Company, Globe Metallurgical, Incorporated, and SKW Metals and Alloys, Incorporated ("plaintiffs") challenge the Department of Commerce's

("Department" or "Commerce") remand determination in *Final Results of Redetermination on Remand Pursuant to Court Order, American Alloys, Inc., et al. v. United States,* Court No. 94–01–00046 (Aug. 16, 1995) (*"Remand Determination"*). Plaintiffs argue the remand's conclusion that energy is physically incorporated into silicon metal departs from departmental practice, is unsupported by substantial evidence on the record and is otherwise not in accordance with law. Defendant responds evidence on the record supports Commerce's conclusion that energy is physically incorporated into silicon metal during the production process. As a result, defendant argues Commerce properly increased the U.S. price ("USP") of the silicon metal at issue by 12.5% to offset the *Reembolso* tax rebate.[1] This Court retained jurisdiction over this action during the pendency of Commerce's remand investigation, where the Court had jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988), which gives this Court jurisdiction to review final results of antidumping administrative reviews completed by the Department of Commerce, International Trade Administration ("ITA").

## I. BACKGROUND

Plaintiffs in this case are producers of silicon metal in the United States, and challenge the final results of Commerce's antidumping duty administrative review on silicon metal[2] manufactured in or exported from Argentina by Electrometalurgica, S.A.I.C. ("Andina") and Silarsa, S.A. ("Silarsa") during the period March 29, 1991 to July 31, 1992. *See Silicon Metal From Argentina; Final Results of Antidumping Duty Administrative Review,* 58 Fed.Reg. 65,336

1. *See infra* n.5.

2. Silicon metal "is not actually a metal. Rather, 'silicon metal' is a product containing at least 89 percent silicon, along with small amounts of other elements." (Pls.' Br. in Supp. of its Mot. for J. Upon Agency Rec. at 2n.2.)

3. In *Final Determination of Sales at Less Than Fair Value: Silicon Metal From Argentina,* 56 Fed.Reg. 37,891, 37,895 (Dep't Comm.1991), Commerce determined silicon metal from Argentina was being sold at less than fair value in the United States. When an antidumping investigation discloses the existence of dumping, an antidumping duty will be imposed when the import sales materially injure, threaten to materially injure, or materially retard the establishment of an

(Dep't Comm.1993) (*"Final Results"*). The events which led to this action are set forth below.

### A. Administrative Review of Antidumping Duty Order

On September 3, 1992, Commerce published a notice announcing the opportunity to request an administrative review of the antidumping duty order on silicon metal from Argentina.[3] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity to Request Administrative Review,* 57 Fed.Reg. 41,725 (Dep't Comm.1992). On September 30, 1992, plaintiffs and SiMETCO, Inc. filed a timely request for administrative review of the antidumping duty order on silicon metal from Argentina with respect to Andina and Silarsa. Andina and Silarsa also filed timely requests for review with the Department.

In response to the above requests, Commerce initiated an antidumping duty administrative review on imports of silicon metal from Argentina by Andina and Silarsa. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 57 Fed. Reg. 48,201 (Dep't Comm.1992). As part of its review, the Department presented Antidumping Requests for Information ("Questionnaires") to Andina and Silarsa. Silarsa submitted its response to Commerce's questionnaire but subsequently indicated it would no longer participate in the administrative review. Andina maintained it was entitled to upward adjustments to U.S. price ("USP") under the terms of the tax clauses for certain taxes either not collected on export sales or rebated upon exportation.[4] One of these ad-

industry in the United States. *See* 19 U.S.C. § 1671(a) (1988). The antidumping duty is the difference between the foreign market value ("FMV") of the goods and the value of those goods in the United States, known as the U.S. price ("USP"). This difference is also the dumping margin. *See American Alloys Inc. v. United States,* 30 F.3d, 1469, 1474 (Fed.Cir.1994) (*"American Alloys III"*) (citing *Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1576 (Fed. Cir.1993).) In setting the dumping margin in this case, Commerce increased the USP by 12.5% to offset the *Reembolso* tax rebate. *See infra,* n.5. This adjustment lowered the dumping margin on Andina's sales in the United States.

4. Andina also held this position during in the original investigation.

justments involved tax rebates it received under the Government of Argentina's *Reembolso* program.[5] Commerce decided, *sua sponte*, to conduct verification of the data Andina provided in the administrative review and did so at Andina's facilities in Argentina from July 12 to 16, 1993.

On August 23 1993, Commerce published a preliminary determination that silicon metal from Argentina was being sold at less than fair value during the period under investigation. *See Silicon Metal From Argentina; Preliminary Results of Antidumping Duty Administrative Review and Termination in Part,* 58 Fed.Reg. 44,499 (Dep't Comm.1993). Commerce issued the final results of its administrative review on silicon metal from Argentina on December 14, 1994. *See Silicon Metal From Argentina; Final Results of Antidumping Duty Administrative Review,* 58 Fed.Reg. 65,336 (Dep't Comm.1993) (*"Final Results"*) In the final results of the administrative review, Commerce accepted Andina's methodology for calculating certain costs associated with the production of silicon metal and made upward adjustments to USP for the total amount of the rebated taxes Andina received upon export of silicon metal to the United States. Commerce also concluded it was not required to determine whether taxes rebated by the Argentine government under the *Reembolso* program were directly imposed upon the silicon metal or its physically incorporated components before Commerce adjusted USP based upon 19 U.S.C. § 1677a(d)(1)(C)[6] because this form of inquiry occurs in a countervailing duty and not an antidumping investigation. Com-

merce stated "we are satisfied that the 'reembolso' program qualifies as a rebate of indirect taxes within the meaning of section 772(d)(1)(C) of the Tariff Act, and that an adjustment for the amount of the rebate is proper." *Final Results,* 58 Fed.Reg. at 65,-342.

### B. Complaint

On February 14, 1994, plaintiffs challenged certain portions of the *Final Results.* Plaintiffs specifically argued Commerce, in adjusting USP, had not investigated whether the taxes rebated under the *Reembolso* program were imposed directly upon silicon metal or inputs physically incorporated into silicon metal. Plaintiffs asserted such an investigation was necessary to determine which of the taxes rebated under the *Reembolso* program were directly related to the exported merchandise or components physically incorporated therein. As a result, plaintiffs asserted Commerce's upward adjustments to USP improperly reduced the dumping margin, were unsupported by substantial evidence on the record and were otherwise not in accordance with law. (Compl. at 6.) Plaintiffs requested this Court remand the case to Commerce for further proceedings consistent with the judgment of this Court.[7]

On March 17, 1994, plaintiffs moved to stay the proceedings in this action pending the resolution of an appeal to the Court of Appeals for the Federal Circuit ("CAFC") of the Court of International Trade's ("CIT") decision in *American Alloys, Inc. v. United States,* 17 CIT 8, 810 F.Supp. 1294 (1993)

---

**5.** The manufacturers of silicon metal in Argentina are subject to several domestic taxes. The *Reembolso* program was established in 1971 and authorizes the Argentine government to rebate to silicon metal producers taxes and import duties levied on the purchases of raw materials used in the production of silicon metal. *See American Alloys, Inc. v. United States,* 17 CIT 8, 9, 810 F.Supp. 1294, 1295 (1993) (*"American Alloys I"*); Def.'s Resp. to Pls.' Comm. on Remand Determ. (*"Def.'s Resp."*) at 2.

**6.** *See infra* n. 12.

**7.** Counts I(a) and (c) of the complaint, which are at issue in the present remand determination state:

The Department's improper upward adjustments to USP reduced the antidumping margin assessed in the results of the administrative

review. The following conclusions by the Department are unsupported by substantial evidence on the record and are otherwise not in accordance with law:

(a) the Department's conclusion that the adjustment to USP for rebates of indirect taxes under section 772a(d)(1)(C) of the Act, 19 U.S.C. § 1677a(d)(1)(C), is not limited to rebates of taxes imposed directly on the merchandise under investigation or components thereof;

. . . .

(c) the Department's methodology of making an upward adjustment to USP for the full amount of the rebate received by Andina under the *reembolso* program by applying the absolute tax rate to the price of comparison merchandise sold in the country of exportation rather than to the price of the exported goods.

(Compl. at 6–7.)

("*American Alloys I*"). In *American Alloys I*, plaintiffs challenged Commerce's final determination in the original antidumping duty investigation of silicon metal from Argentina.[8] *See Final Determination of Sales at Less Than Fair Value: Silicon Metal from Argentina*, 56 Fed.Reg. 37,891 (Dep't Comm. 1991). Both parties agreed the appeal of the original determination before the Federal Circuit involved issues similar to the ones present in this action, such as the proper interpretation and implementation of the statutory provision for adjusting USP pursuant to the tax clause for taxes rebated upon export. On September 11, 1995, this Court granted the motion and stayed the proceedings.

### C. American Alloys III

In *American Alloys, Inc. v. United States*, 30 F.3d 1469, 1474 (Fed.Cir.1994) ("*American Alloys III*"), the Federal Circuit reversed this Court's holding in *American Alloys I* that in an antidumping investigation Commerce need not conduct an inquiry to determine if rebated taxes are imposed directly on the merchandise at issue. The Federal Circuit held the Department may not adjust USP for a rebated tax unless it determines the rebated taxes bear "a direct relationship to the exported product or a physically incorporated component of that product." *Id.* Because Commerce had not determined if Argentina imposed the *Reembolso* taxes "directly upon the exported merchandise or components thereof," the Federal Circuit held Commerce lacked authority to raise USP to account for the rebates. *Id.* Pursuant to the Federal Circuit's determination that Commerce must undertake an inquiry to determine if the rebated taxes were imposed directly on the merchandise at issue, this Court remanded the case for a determination of whether the *Reembolso* taxes quali-

fy as direct taxes. *See American Alloys Inc., v. United States*, Court No. 94–01–00046 (CIT May 1, 1995) (remand order).

### D. Motion for Judgment Upon the Agency Record & Motion for Remand

On January 26, 1995, plaintiffs moved for Judgment Upon the Agency Record pursuant to U.S. CIT R. 56.2, arguing Commerce's refusal to determine whether the taxes rebated under Argentina's *reembolso* program are directly imposed upon silicon metal or its physically incorporated components, as required by statute, was "contrary to the express terms and purpose of the statute." (Pls.' Br. in Supp. of Mot. for J. Upon Ag. Rec. ("Pls.' Br.") at 10.) Plaintiffs argued, "[i]n *American Alloys III*, the CAFC specifically held that before the Department can make any adjustments to USP for rebated taxes, there must be a demonstration of the direct imposition of the tax at issue upon the exported product or its physically incorporated components." (*Id.* at 10–11 (citing *American Alloys III*, 30 F.3d at 1474).)

On April 3, 1995, subsequent to the Federal Circuit's decision in *American Alloys III*, plaintiffs and defendant jointly moved for remand, stating

[t]he appeal of the final determination in the original investigation involved the same parties, similar facts and, in general, the same arguments that are involved in Count I(a) of Plaintiffs' Complaint herein. Accordingly, judicial economy and efficiency would be achieved by permitting the Department to issue a redetermination with respect to Count I(a) that reflects the decision of the Court of Appeals [in *American Alloys III*]. Count I(c) involves a related claim. Therefore, by remanding the issues raised by Counts I(a) and (c) of this action to the Department for redetermina-

---

**8.** In *American Alloys I*, the Court of International Trade ("CIT") remanded to Commerce the final antidumping duty determination in the original investigation, instructing the Department to limit the adjustment to USP for any tax rebate to the amount of the tax actually passed through to home market purchasers. *See American Alloys I*, 17 CIT at 17, 810 F.Supp. at 1301. In *Court of International Trade Decision*, 58 Fed.Reg. 38,361 (Dep't Comm.1993), Commerce found no taxes were being passed through and the CIT affirmed this determination. *See American Alloys, Inc. v.*

*United States*, 17 CIT 613, 824 F.Supp. 238 (1993) ("*American Alloys II*"). The CIT also affirmed the Department's determination that an inquiry to determine if the rebated taxes were imposed directly on the merchandise at issue was relevant to a countervailing duty investigation but not to an antidumping investigation. "Commerce properly determined that it need not conduct a 'physical incorporation' subsidy inquiry before making an upward adjustment to USP for indirect taxes rebated pursuant to Argentina's reembolso program." *American Alloys I*, 17 CIT at 14, 810 F.Supp. at 1299.

tion, the Court can expedite the resolution of the instant appeal.

(Joint Mot. For Remand at 2.) On May 1, 1995 this Court granted the joint motion for remand, ordering Commerce to file its remand determination with the Court within 120 days of the remand order. The Court ordered Counts I(a) and (c) be remanded to Commerce for it to make a redetermination consistent with the Federal Circuit's decision in *American Alloys III.*[9]

On May 23, 1995, Commerce requested Andina identify which components used in the production of silicon metal were physically incorporated into silicon metal and which of the taxes paid, but rebated under the *Reembolso* program, were directly related to the silicon metal or the components physically incorporated therein. *See Remand Determination* at 2. Andina responded, but provided information only with respect to the physical incorporation of electrical energy and those related taxes.[10] Because of the amount of information submitted by Andina and given the controversial nature of the physical incorporation issue, Commerce conducted a verification at Andina's headquarters in Buenos Aires. (Def.'s Resp. to Pls.' Comm. on Remand Dterm. ("Def.'s Resp.") at 3.) Commerce verified the calculations provided by Andina that established (1) the amount of internal energy in silicon metal, (2) the total amount of energy used in, and generated by, the chemical reaction, (3) the amount of heat loss in the production process, and (4) the breakdown of total energy between chemical energy, in-plant generated energy, and purchased energy. *Remand Determination* at 5–6. *See Verification Report* (*reprinted in* Pub.App. to Def.'s Resp. to Pls.' Comm. on Remand Results ("Def.'s App.") Attach. 1).

On July 31, 1995, Commerce issued draft final results of redetermination to the interested parties and received comments from the plaintiffs on August 9, 1995. Commerce issued its remand determination on August 16, 1995. *See Final Results of Redetermination on Remand Pursuant to Court Order, American Alloys, Inc., et al. v. United States,* Court No. 94–01–00046 (August 16, 1995) (*"Remand Determination"*). In accordance with the Federal Circuits's opinion and this Court's remand order, the Department analyzed whether indirect taxes rebated under Argentina's *Reembolso* program should be accounted for in the calculation of U.S. price pursuant to 19 U.S.C. § 1677a(d)(1)(C)[11] when determining the dumping margin. Andina submitted information concerning only the physical incorporation of energy into the production of silicon metal and the taxes rebated to this input and the Department allowed adjustment to USP solely for the rebated energy taxes received under the *Reembolso* program. Commerce calculated the dumping rates for Andina by making an upward adjustment to USP for the amount of the *Reembolso* tax rebate received for energy. *See Remand Determination* at 6. Plaintiffs filed comments on the *Remand Determination* on October 11, 1995. Defendants responded to plaintiff's comments on November 27, 1995.

### E. Additional Motions

On December 15, 1995, plaintiffs moved for Judgment on the Remand Record and the Record of the Underlying Administrative Review. Plaintiffs urged this Court hold the remand results to be unsupported by substantial evidence and otherwise contrary to law "because the U.S. Department of Commerce ... erroneously granted an upward adjustment to U.S. price for taxes rebated under Argentina's *Reembolso* program when the taxes were not directly imposed on silicon metal or a physically incorporated component

---

**9.** On May 11, 1995, this Court denied plaintiff's Motion for Judgment Upon the Agency Record as "moot and superceded by [the remand] order dated May 11, 1995." *American Alloys, Inc. v. United States,* Court No. 94–01–00046 (CIT May 11, 1995) (order denying plaintiffs' Motion for Judgment Upon the Agency Record).

**10.** In its June 7, 1995 response to the Department's Questionnaire, Andina explained because it did not have the resources to prove the "direct

and 'cascading' effect of 18 taxes," "Andina will only assign its resources to defend that energy is a physically incorporated component (a component that becomes an actual part of the resulting product). Andina selected energy because of the relative weight of energy cost into the final product and because of the incidence of indirect taxes imposed on energy." (Pls.' App. Tab 11 at 1.)

**11.** *See infra* n. 12.

of silicon metal." (Pls.' Mot. For J. on Remand R. and R. of Underlying Admin. Rev. at 1–2.) Plaintiffs also requested the Court remand the matter to Commerce for it to recalculate the dumping margins and cash deposits of estimated dumping duties on imports of silicon metal from Argentina to eliminate any adjustment to USP for taxes rebated under the *Reembolso* program. In their motion, plaintiffs indicated plaintiffs and defendant agree the Court can decide the issues in this case without further briefing. *Id.* at 2.

On the same day, plaintiffs moved for Oral Argument on the Motion for Judgment Upon the Remand Record and the Record of the Underlying Administrative Review in order to "argue before this Court the law and facts at issue in the instant appeal." (Pls.' Mot. for Oral Arg. at 3.) On January 31, 1996, this Court denied plaintiffs' Motion for Oral Argument.

## II. CONTENTIONS OF THE PARTIES

### A. Plaintiffs

Plaintiffs argue the remand determination is unsupported by substantial evidence on the record and is otherwise not in accordance with law in four principal respects. First, plaintiffs maintain the remand determination grants an upward adjustment to USP for taxes directly imposed on electricity, "notwithstanding the fact that the interested parties agree, and the record establishes, that *electricity* is not physically incorporated into the final product." (Pls.' Comm. on Remand Results ("Pls.' Comm.") at 3.) Second, plaintiffs argue the remand determination "would grant an adjustment to USP for taxes imposed on a production input that—like a fuel—is merely used to generate heat, and is consumed when it is used for that purpose." (*Id.*) Third, plaintiffs contend the remand determination "would grant an adjustment to USP for an input that is *not a physical substance,* and does not become a *physical property* of the resulting product and, therefore, is *not physically incorporated* into that product." (*Id.*) Finally, plaintiffs conclude the remand determination is "contrary to the evidence on the record, statutory and case law, established Department practice and prior Department determinations in cases involving indistinguishable facts, which were correctly decided under applicable law." (*Id.*)

### B. Defendant

Defendant argues Commerce's remand determination demonstrates its factual conclusion regarding the physical incorporation of electrical energy "*is* supported by substantial evidence on the record." (Def.'s Resp. at 5.) Defendant maintains although plaintiffs have presented an alternative interpretation of the record evidence, "it is not enough for it simply to advance an alternative interpretation, arguing that the evidence allegedly supports its position as well." (*Id.*) Rather, defendant contends, "this Court has previously pointed out 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" (*Id.*) (quoting *Daido Corp. v. United States,* 893 F.Supp. 43, 48 (CIT 1995) (further citations omitted).) In addition, defendant argues although there is case precedent involving other products where the Department has determined that energy has not met the physical incorporation standard, physical incorporation is a question of fact to be determined for each product in each case.

## III. STANDARD OF REVIEW

This Court's jurisdiction to review the final results of Commerce's remand determination is limited to determining whether Commerce complied with the instructions of the Court and whether the remand results are supported by substantial evidence on the record and are otherwise in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

## IV. DISCUSSION

### A. Adjustments to USP

In order to prevent distorted dumping margins, United States antidumping laws

permit numerous adjustments to foreign market value and U.S. price to account for differences between these two value measurements arising for reasons unrelated to dumping. *See, e.g.,* 19 U.S.C. §§ 1677a(d), 1677a(e), 1677b(a)(1), 1677b(a)(4) (1988); *see also Smith–Corona Group v. United States,* 1 Fed. Cir. (T) 130, 132–33, 713 F.2d 1568, 1571–72 (1983) (explaining fair market value and U.S. price represent prices in different markets affected by a variety of circumstances in the chain of commerce by which the merchandise reached the export or domestic market; pointing out both values are subject to adjustments in an attempt to reconstruct the price at a specific, "common" point in the chain of commerce, so that value can be fairly compared on an equivalent basis). Therefore, to avoid distortion of the dumping margin merely because an exporting country taxes home market sales but not export sales, for example, U.S. price can be adjusted so domestic taxes do not raise the apparent cost of the merchandise in the home country in comparison to merchandise's price in the United States. *See* 19 U.S.C. § 1677a(d)(1)(C) (1988).[12]

While both parties in this case agree case law now dictates Commerce may only adjust USP for taxes imposed directly on the product subject to investigation or on an input physically incorporated into that product,[13] they disagree on the question of whether energy is physically incorporated into silicon metal during the production process and then retained in the metal in this case.[14] As a result, this Court must determine whether the Department's conclusion on remand holding electrical energy to be physically incorporated into silicon metal is supported by substantial evidence on the record and is otherwise in accordance with law.[15]

B. *Energy as a Physical Input of Silicon Metal*

■ Plaintiffs argue "the record of this remand is completely devoid of *any* evidence that would support a determination that energy used in the silicon metal production process becomes a physical part of the silicon metal." (Pls.' Comm. at 7.) Plaintiffs contend the energy[16] used in the production of

**12.** The applicable statute, 19 U.S.C. § 1677a(d)(1)(C) (1988) provides

  **(d) Adjustments to purchase price and exporter's sales price.**
    The purchase price and the exporter's sales price shall be adjusted by being—
    (1) increased by—
    . . . .
    (C) the amount of any taxes imposed in the country of exportation *directly upon the exported merchandise or components thereof,* which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are *added to or included in the price* of such or similar merchandise when sold in the country of exportation.
19 U.S.C. § 1677a(d)(1)(C) (1988) (emphasis added).

**13.** *See supra* pp. 383–384 for a discussion of *American Alloys III.*

**14.** Plaintiffs and defendant agree on the basic chemical equation that results in the formation of silicon metal. "[B]y combining a source of silicon, such as quartz, with a carbonaceous reductant and a source of energy the result will be silicon metal plus carbon monoxide and an amount of heat loss." *Remand Determination* at 4. The *Remand Determination* continues to note "[t]he basic disagreement between the parties is whether the resulting silicon metal actually re-

tains the energy used to create the chemical reaction." *Id.*

**15.** In its Questionnaire to Andina, Commerce explained

  [u]nder the law applicable to this remand, the Department considers that a physically incorporated component is a component that physically becomes a part of the resulting product. Thus, a physically incorporated component is not a component that is simply consumed in the production of the resulting product, but a component that becomes an actual part of the resulting product.
(*See Department's Remand Questionnaire of June 7, 1995, reprinted in* Pl.'s App. Tab 11 at 1.) The Department continued on to acknowledge it considered quartz to be a component that physically becomes a part of the resulting product, silicon metal, but asked Andina to explain why it believes other inputs—namely energy—are physically incorporated into silicon metal, and to show how each input becomes part of the resulting product. (*Id.*)

**16.** In discussing energy, plaintiffs refer specifically to electricity. Plaintiffs state taxes for which Andina claimed an adjustment are directly imposed on *electricity* and not on any other form of energy. (Pls.' Comm. at 3–4.) Because the words energy and electricity are used interchangeably throughout the papers of the parties,

silicon metal is not a physical input and is not physically incorporated into the silicon metal produced. Plaintiffs maintain "[e]lectricity is not a raw material or a substance and, therefore, is not a physical input.... [T]he 'potential' energy that exists in the final product is not a *physical* property of silicon metal. Accordingly, the electricity used in producing silicon metal is not physically incorporated into the silicon metal." (*Id.* at 5–6.) Rather, plaintiffs argue the only raw material physically incorporated into silicon metal is the silicon from the quartz used to make the metal. Electrical energy, according to plaintiffs, does not enter into the chemical reaction, but merely supplies heat to the production process and is consumed in the process of generating heat. Plaintiffs conclude because heat is not a material, it cannot be a physical input into the production of silicon metal. Additionally, plaintiffs argue electricity "is not required to produce silicon metal" because "[t]here are several other possible sources of heat" and "the same chemical reaction ... occurs regardless of the heat source." (Pls.' Comm. at 15.) [17] Andina, however, maintained:

> the electricity is not merely used to heat the charge. Through the heat of the charge with electricity, the silicon of quartz incorporates energy and becomes silicon metal. The energy is incorporated into the silicon metal. A smaller portion of energy is lost in the process. It is not the dissipation of heat that makes the silicon of the quartz to become [sic] silicon metal; it is the incorporation of energy that makes

the silicon of the quartz to become [sic] silicon metal.

*Response of Andina to Department's Deficiency Questionnaire of June 30, 1995* (*reprinted in* Pls.' App. Tab 6 at 5).

In making its determination, Commerce asked Andina to provide any text or industry publication illustrating energy is physically incorporated into silicon metal or, alternatively, for an affidavit from a chemical engineer or other company official attesting to this claim. *See Response of Andina to Department's Remand Questionnaire of June 7, 1995* (*reprinted in* Pls.' App. Tab 11). Commerce relied on the information Andina presented during verification, including a review of chemistry, chemical engineering and electrical engineering textbooks, as well as technical articles and concluded Andina had demonstrated "silicon metal does have a physical property of energy which is referred to as internal energy. This internal energy is measurable before and after the reaction takes place which produces silicon metal." *Remand Determination* at 7. Commerce explained if the reaction is reversed through a process called metalthermia, the energy may be removed from the silicon metal, "thus, demonstrating that energy is physically incorporated into the silicon metal." *Id.* Commerce explained Andina's production of silicon metal is characterized as electrointensive, due to the use of electrical energy in the production process, and, as such, electrical energy is a necessary component in the pro-

this Court finds it useful to review briefly how these terms have been used during the course of this proceeding. In the *Remand Determination,* Commerce states plaintiffs "have made too fine a distinction between 'electricity' and 'electrical energy' to be meaningful." *Remand Determination* at 10. Commerce stated during verification, Andina's electrical engineers discussed with Commerce the issue of whether electricity can be equated to energy. *See Verification Report of July 25, 1995* (*reprinted in* Def.'s App. Attach. 1 at 4.) Officials explained electricity creates the energy used in the production process, which is referred to as electric energy and is measured in kilowatts per hour. The Verification Report concluded "typically when electricity is discussed it is in the context of the amount of energy or heat that derives from it to be used to produce reac-

tions." *Id.* at 5. Commerce adds Andina's energy supplier confirmed this fact in a letter describing the "energy" consumed by Andina and the "energy" taxes which were applied to Andina's purchases. *Remand Determination* at 10.

17. Plaintiffs also cite the affidavit of silicon metal expert Earl K. Stanley, who states "[i]n the silicon metal production process, the flow of electrons from the electrode does not enter into the chemical reaction; it simply supplies heat to the process." (Pls.' App. Tab 7 at 2.) The expert added, "[e]lectricity is not needed to produce silicon metal.... A number of other sources of heat may be used.... Heat is not a material.... Therefore, heat is not a physical input into the production of silicon metal." (*Id.*)

cess Andina employs to produce silicon metal.[18]

In addressing the question of whether energy is physically incorporated into silicon metal, Commerce addressed plaintiffs' arguments that (1) electricity is simply fuel used to generate heat used in the reduction process, and, thus, the potential energy that exists in the final product is not a physical input of silicon metal; and (2) electricity is not a raw material or a substance and, therefore, not a physical input. (Pls.' Comm. at 4–5.) Commerce, however, stated it "disagree[d] with petitioners' assertion that energy is not physically incorporated into the silicon metal that is produced.... [P]etitioners' portrayal of electricity as being analogous to a fuel is misguided." *Remand Determination* at 8. In support of its determination, Commerce pointed to a technical article written for a conference of the Norwegian Ferroalloy Research Organization held in June 1995 and coauthored by Elkem Metals Company, one of the plaintiffs in this case, which addresses energy recovery in the production of ferroalloy products, including silicon metal. The article concludes:

> Energy input to ferro alloy furnaces in Norway is roughly divided in two equal parts: chemical energy in the form of carbonaceous reduction materials, and electrical energy. *About half of this total energy* is preserved in the produced alloy while the rest leaves the process in the form of various heat losses.

**18.** In Andina's questionnaire response, Andina states its activity "is denominated 'electrointensive' due to the large proportion of electrical energy in its production process." *See Questionnaire Response of June 1, 1995* (reprinted in Def.'s App. Attach. 4 at 1). Andina's response continues on to explain

> [t]he productive process for the manufacture of silicon metal is a process known as 'electrochemical' and/or 'electrothermic', and consists of the elimination of oxygen form [sic] quartz through the activation or rupture of the molecule through the application of energy.
> This reaction, based on scientific and technical knowledge with internationally available industrial applications, can only be carried out using electrical energy.
> ....
> Two very significant conclusions can be drawn from this explanation:
> a) the energy used in the production process forms a component part of the products obtained as a consequence of that process.

*Remand Determination* at 9 (quoting *Energy Recovery in the Norwegian Ferro Alloy Industry* at 165, reprinted in Def.'s App. Attach. 3 at 2; Pls.' App. Tab 10 at 26). Although plaintiffs argue "[t]he statement in the article that energy is 'preserved' in the produced alloy merely refers to the change in the energy balance that accompanies all chemical reactions," (Pls.' Comm. at 16 n.58), Commerce also pointed out a silicon expert at the United States Department of Energy's Laboratory in Golden, Colorado confirmed the terms "physically incorporated" and "preserved" could be used interchangeably in this context. *See Department of Energy Memo of July 27, 1995* (reprinted in Def.'s App. Attach. 2 at 1).[19] Commerce concluded, therefore, "as indicated by one of petitioners' own companies, energy is physically incorporated into silicon metal." *Remand Determination* at 9.

In the *Remand Determination,* Commerce concluded, "[b]ased on an analysis of the information Andina placed on the record and on our verification of that information ... part of the internal energy measured in the silicon metal is derived from the electrical energy Andina uses in its production of silicon metal." *Remand Determination* at 5. Commerce explains

> [t]his conclusion was further confirmed after several discussions with a silicon expert from the United States Department of En-

> b) the energy incorporated in the production process is not used to generate motor or mechanical force, but rather as a principal raw material to make possible the chemical reaction of reduction.

*Id.* at 1–2.

**19.** Plaintiffs point out this same expert said he would not characterize energy as a physical property of silicon metal. (Def.'s App. Attach. 2.) Commerce found plaintiffs

> mischaracterized the statements made by the silicon expert consulted by the Department. When asked about the physical incorporation of energy in silicon metal, the expert stated that "as a physicist, working with silicon, he would not characterize energy as a physical property of silicon metal". However, the expert added that chemists producing silicon metal would be concerned with the internal energy of the silicon metal.

*Remand Determination* at 9 (citation omitted).

ergy. In addition, a technical article . . . . supports this conclusion . . . Finally, at verification we also reviewed information explaining how the reaction can be reversed and the energy removed from the silicon metal. . . . We found this information telling because energy would have to exist in the product in order for it to be removed.

*Remand Determination* at 5 (citation omitted). This Court finds Commerce's conclusion that energy is physically incorporated into silicon metal during the production process is supported by substantial evidence on the record and is otherwise in accordance with law. Commerce correctly followed the instructions contained in this Court's remand order to determine whether any of the components of silicon metal was physically incorporated into the product, and, if so, to determine whether the rebated tax was directly related to the merchandise in question and its physically incorporated components.

### C. Taxes for Which Adjustments May be Made

In addressing the question of whether Commerce correctly calculated the rebate adjustment, plaintiffs argue Commerce disregarded the express language of the statute and the intent of Congress in adjusting USP for the tax rebate Andina received for electricity it purchased and impermissibly "expanded the range of rebated taxes for which an adjustment to USP can be made." (Pls.' Comm. at 18.) Defendant, however, maintains "[t]o the contrary, Commerce has followed the express language of the statute and the intent of Congress by only making an adjustment for that portion of the tax on electrical energy purchased by Andina and rebated under the Reembolso program on exportation, which was shown to be physically incorporated into the exported silicon metal." (Def.'s Resp. at 18.)

This Court disagrees with plaintiffs' argument Commerce incorrectly applied the law by adjusting USP for taxes imposed on Andina's purchase of electricity. Rather, the Court finds Commerce's conclusion

since Andina pays taxes on electrical energy, and electrical energy is a necessary input in Andina's production of silicon metal, and the electrical energy is measurable in the silicon metal, we have correctly applied the law by adjusting USP for taxes imposed on Andina's purchase of electrical energy

*Remand Determination* at 10, to be supported by substantial evidence on the record and otherwise in accordance with law. After Commerce determined electrical energy was physically incorporated into silicon metal, Commerce calculated the portion of energy attributable to electrical energy purchased by Andina by verifying the calculations Andina provided establishing (1) the amount of internal energy in silicon metal, (2) the total amount of energy used in, and generated by, the chemical reaction, (3) the amount of heat loss in the production process, and (4) the breakdown of total energy between chemical energy, in-plant generated energy, and purchased energy. *Remand Determination* at 5–6. Commerce then calculated the percentage purchased energy represented of the total energy physically incorporated in silicon metal, and allowed a tax rebate adjustment for that amount. *See Remand Determination* at 6. Commerce also explains Andina's energy supplier provided it with invoices listing the amount of energy purchased by Andina and the relevant amount paid in energy taxes. *Remand Results* at 10. This Court finds Commerce's adjustments to USP accounting for a portion of the taxes imposed on purchased electricity are supported by substantial evidence on the record and are otherwise in accordance with law.

### D. Past Departmental Practice

■ Plaintiffs also argue Commerce's treatment of energy in this case is "contrary . . . to consistent Department precedent," (Pls.' Comm. at 7), because "the Department has never found any form of energy to be physically incorporated into a final product." (*Id.* at 12.) In support of this argument, plaintiffs cite previous determinations in which Commerce did not classify electricity or energy as a physically incorporated input or found energy or electricity was not physically incorporated into the final product. *See* Pls.' Comm. at 8–10 (citing *Cold–Rolled Carbon Steel Flat–Rolled Products From Argen-*

*tina: Final Affirmative Countervailing Duty Determination and Countervailing Duty Order,* 49 Fed.Reg. 18,006, 18,009–10 (Dep't Comm.1984) (finding fuel and electricity are not physically incorporated into final product)); *Amoxicillin Trihydrate and Its Salts From Spain; Final Results of Administrative Review of Countervailing Duty Order,* 47 Fed.Reg. 33,999, 33,400 (Dep't Comm. 1982) (in countervailing duty investigation involving amoxicillin trihydrate, Commerce discussed difficulties in identifying physically incorporated inputs, stating "[e]nergy can in no way be considered physically incorporated in the final product"); *Final Affirmative Countervailing Duty Determination; Potassium Permanganate From Spain,* 47 Fed. Reg. 29,300, 29,302 (Dep't Comm.1982) (in countervailing duty investigation involving potassium permanganate from Spain, electricity used in an electrolytic process was "not physically incorporated into final product"); *Ferroalloys From Spain; Final Countervailing Duty Determination,* 45 Fed. Reg. 25 (Dep't Comm.1980) (in proceeding involving ferroalloy products manufactured using same smelting process as silicon metal, electricity was not classified as a physical input used in the production process). Plaintiff likens this case to the ones cited above and concludes electricity is not a physically incorporated input but "is used to perform the same function as a fuel—to generate heat." (Pls.' Comm. at 10.) Plaintiffs add "energy is not a physical substance and is not a physical component of final products." (*Id.* at 12.)

In addition to the above precedent, plaintiffs also cite Annex I to the Department's countervailing duty regulations which includes an explanation of the "physical incorporation test," and, according to plaintiffs, recognize energy is not a physically incorporated input. The regulation states:

ANNEX I—ADMINISTRATIVE AND INTERPRETIVE GUIDELINES FOR DETERMINATION AND CALCULATION OF SUBSIDIES

1. The physical incorporation test: ... Under that test, the rebate or remission of fiscal charges on items physically incorporated in the exported product is not considered a subsidy. Rebated taxes on services, catalysts and other items (*e.g. energy* ) not incorporated in the product ... would be treated as ... a subsidy. 19 C.F.R. § 355, Annex I (1988) (emphasis added).[20]

Defendant, however, argues plaintiffs cannot rely on Commerce's previous determinations as if they constitute an irrebuttable presumption that electricity or energy could never be found to be physically incorporated into a product....

[P]rior Commerce determinations concerning the non-physical incorporation of electricity or energy do not preclude Commerce from determining in a subsequent proceeding that electrical energy is physically incorporated into an exported product if there is substantial evidence on the record supporting such a finding, as there is in the instant proceeding.

(Def.'s Resp. at 13–14.) Defendant also argues the passage of the Annex I cited by plaintiffs "does not indicate that 'other items,' such as energy, could never be found to be incorporated into the final product." (Def.'s Resp. at 14n.6.)

Commerce acknowledges "there is case precedent involving other products where the Department has determined that the energy has not met the physical incorporation standard." *Remand Determination* at 4. Commerce, however, maintains past practice "does not mean there is an irrebuttable presumption that electricity or energy could never be found to be physically incorporated if record evidence were to support such a finding," *Remand Determination* at 11–12, because case law has established " '[p]hysical incorporation is a question of fact to be determined for each product in each case.' " *Remand Determination* at 12 (quoting *Ferroalloys from Spain; Preliminary Results of Administrative Review of Countervailing*

---

**20.** Plaintiffs explain in 1988 the Department deleted Annex I due to concerns regarding the inclusion of statements of agency practice in the regulation and not due to a change in Department policy regarding the physical incorporation test. (Pls.' Comm. at 11 n.42.)

*Duty Order,* 48 Fed.Reg.4,019, 4,020 (Dep't Comm.1983)); *Oleoresins of Paprika From Spain; Preliminary Results of Administrative Review of Countervailing Duty Order,* 46 Fed.Reg. 61,684, 61,684–85 (Dep't Comm. 1981).

Commerce points to other instances where it has determined raw materials and inputs were physically incorporated into the final product. *See Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Oil Country Tubular Goods From Argentina,* 49 Fed.Reg. 46,464, 46,466 (Dep't Comm.1984) (finding portion of natural gas used in reduction of iron and other inputs claimed under transformation cost category met physical incorporation test after verification demonstrated physical incorporation); *Final Results of Administrative Review of Countervailing Duty Order;Oleoresins of Paprika From Spain,* 47 Fed.Reg. 11,916, 11,917 (Dep't Comm.1982) (finding portion of solvent which accompanies oleoresins throughout the entire production process to be physically incorporated when foreign producers submitted evidence allowing Commerce to quantify the portion). Additionally, in *Unwrought Zinc From Spain; Final Results of Administrative Review [and] Countervailing Duty Order,* 48 Fed.Reg. 35,689, 35,690 (Dep't Comm.1983), respondents asked Commerce to take account of a rebate of indirect taxes on electricity used in transferring electrons to form zinc because that portion of electricity is physically incorporated into the manufacturing process. Although Commerce did not allow a rebate, it noted "the exporters were unable to provide evidence itemizing that portion of electricity serving as necessary waste in incorporating electrons to form zinc." *Id.*

The implication of these prior determinations, Commerce argues, "is that if evidence were presented to demonstrate that an input which typically is not considered to be physically incorporated is shown to be so, and can be quantified, then the Department would not reject that evidence out of hand." *Remand Determination* at 13. In this case, Commerce concludes Andina placed evidence on the record demonstrating a portion of the electrical product, and Commerce was able to quantify the amount of the physically incorporated energy on which to base the allowed tax adjustment. *Id.* This Court finds the evidence Andina placed on the record, as well as Commerce's subsequent verification of that evidence, which included consulting an independent expert on silicon from the Department of Energy who corroborated Andina's position and a technical article co-authored by one of the plaintiffs concluding "energy is 'preserved' in silicon metal", *Remand Determination* at 13, indicates Commerce properly determined energy is preserved in silicon metal after the production process is complete. Commerce's conclusion "[t]hus, notwithstanding the Department's previous determinations with respect to the non-physical incorporation of electricity or energy, there is sufficient evidence on the record in this proceeding demonstrating that a portion of the electrical energy used in the production of silicon metal is, in fact, physically incorporated into the final product," *Remand Determination* at 13, is supported by substantial evidence and is otherwise in accordance with law.

## CONCLUSION

This Court finds the *Remand Determination's* conclusions (1) finding energy is physically incorporated into silicon metal during the production process, (2) adjusting USP for the portion of taxes imposed on energy, and (3) concluding past departmental practice does not preclude Commerce from finding the physical incorporation standard was met in this case, are supported by substantial evidence on the record and are otherwise in accordance with law. Accordingly, plaintiffs' challenges are rejected and Commerce's *Remand Determination* is sustained.

## JUDGMENT ORDER

This case having been duly submitted for decision and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision it is hereby

**ORDERED** that plaintiffs' motion for judgment on the remand record is denied; and it is further

**ORDERED** Commerce's *Remand Determination* is sustained, and it is further

**ORDERED** that this action is dismissed.